**SO ORDERED.**

**SIGNED this 08 day of July, 2010.**

_____
**Randy D. Doub**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### NEW BERN DIVISION

**IN RE:**

| | |
|---|---|
| **MONA L. HAMMOCK** | **CHAPTER 7** |
| | **CASE NO. 09-11485-8-RDD** |
| **DEBTOR** | |

### ORDER GRANTING MOTION TO DISMISS CHAPTER 7
### PROCEEDING PURSUANT TO 11 U.S.C. § 707(b)(1)

Pending before the Court is the Motion to Dismiss Chapter 7 Proceeding Pursuant to 11

U.S.C. § 707(b)(1) and (b)(3) filed on March 11, 2010 (the "Motion to Dismiss") by the Bankruptcy

Administrator and the Response to the Motion to Dismiss filed on March 17, 2010 (the "Response")

by Mona L. Hammock (the "Debtor"). A hearing was conducted in Wilson, North Carolina on June

10, 2010 to consider the Motion to Dismiss and the Response.

### BACKGROUND

1. On December 31, 2009, the Debtor filed a voluntary petition for relief under Chapter 7 of

Title 11 of the United States Code (the "Bankruptcy Code"). As part of her petition, the

Debtor filed her Schedules, Official Form B22A - Chapter 7 Statement of Current Monthly

Income & Means Test ("Form B22A"), and her Statement of Financial Affairs. Based on

the Debtor's initial calculation of her current monthly income, a presumption of abuse did not arise based on the allowed expenses and deductions set forth on Form B22A.

2.    On February 11, 2010, the Bankruptcy Administrator requested the Clerk of Court to issue a notice of presumed abuse. Pursuant to 11 U.S.C. § 704(b)(2), the Statement of Presumed Abuse was timely docketed on February 12, 2010.

3.    On March 2, 2010, the Debtor filed an Amended Statement of Financial Affairs, Amended Summary of Schedules, Amended Schedule I, Amended Schedule J, and an Amendment to her Chapter 7 Statement of Current Monthly Income and Means Test Calculation - Official Form 22A (collectively referred to herein as the "March 2nd Amendments"). Although the Debtor had an above-median income on the March 2nd Form B22A, based on her calculation of her current monthly income, she stated that a presumption of abuse did not arise.

4.    On March 11, 2010, the Bankruptcy Administrator filed the Motion to Dismiss.

5.    On March 17, 2010, the Response was filed by the Debtor.

6.    On March 17, 2010, the Debtor filed her Second Amended Statement of Financial Affairs, Second Amended Summary of Schedules, Second Amended Schedule I, Second Amended Schedule J, and Second Amendment to the B22A Form (collectively referred to herein as the "March 17th Amendments"). The Debtor contended that even with her above-median income and the amendments to Form B22A, a presumption of abuse did not arise.

7.    Subsequently, on June 9, 2010, the Debtor filed her Third Amended Statement of Financial Affairs, Third Amended Summary of Schedules, Third Amended Schedule I, Third Amended Schedule J, and Third Amendment to Form B22A (collectively referred to herein

2

as the "June 9th Amendments").  The June 9th Amendment to Form B22A provided that the presumption of abuse did not arise.

8.  Also on June 9, 2010, the Debtor filed an affidavit of her financial situation (the "June 9th Affidavit") and the financial arrangement established by a prenuptial agreement that she and her current husband entered into prior to their marriage on May 25, 2001 (the "Prenup Agreement"). The Debtor provided a copy of her Prenup Agreement with her affidavit.

9.  On June 10, 2010, the Debtor filed an affidavit of her financial situation and her school loan debt (the "June 10th Affidavit").  Attached to the affidavit are documents from the College Foundation, Inc. provided to her in connection with her school loans (the "CFI Documents").[1]

## ARGUMENT

Pursuant to the Motion to Dismiss, the Bankruptcy Administrator alleges that the Debtor has taken several double deductions in connection with her marital adjustment and expenses and has improperly deducted her school loans from her disposable monthly income available for distribution to unsecured creditors.  As such, the Bankruptcy Administrator contends that the Debtor, in fact, has a positive disposable monthly income and, therefore, disputes the Debtor's assertion that the presumption of abuse does not arise in this case or that the presumption of abuse has been overcome.

The Bankruptcy Administrator also argues that when taken as a whole, even if the presumption of abuse does not arise, this case should be dismissed based on the totality of the circumstances of the Debtor's financial situation under Section 707(b)(3).  More specifically, the Bankruptcy Administrator argues that after reviewing the Debtor's bank statements and non-filing

---

[1] Although these documents were not admitted at the hearing on June 10, 2010, the affidavit and attachments are on the case docket. Docket entry no. 32.

spouse's bank statements, it appears as if the Debtor pays for most of the day-to-day living expenses for their household and the non-filing spouse contributes very little. The Bankruptcy Administrator alleges that the non-filing spouse is then permitted to save significant amounts of money whereby the Debtor may benefit from such savings.

The Debtor disputes that she has any disposable monthly income based on her calculation of the means test and that, even if her husband earns a substantial income, she is not entitled to such funds based on her Prenup Agreement. As such, she argues that the Motion to Dismiss should be denied.

## DISCUSSION

The Bankruptcy Administrator asserts that this case should be dismissed pursuant to either Section 707(b)(1) or Section 707(b)(3) of the Bankruptcy Code based on the Debtor's abuse of the provisions of chapter 7. As the moving party, the Bankruptcy Administrator has the burden of proving abuse under Section 707. *In re Sale*, 397 B.R. 281, 284 (Bankr. M.D.N.C. 2007).

Section 707(b)(1) provides that the Court may dismiss a case under chapter 7 or, with the consent of the debtor, convert a case to chapter 11 or 13, should the court determine that granting relief would be an abuse of the provisions of chapter 7. To determine whether granting relief would be an abuse, a court should presume an abuse exists if the debtor's current monthly income reduced by certain amounts and multiplied by 60 is not less than the lesser of "(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,575, whichever is greater; or (II) $10,950." 11 U.S.C. § 707(b)(2)(A)(i). The Debtor has $71,287.28[2] in non-priority, unsecured claims. Twenty-five

---

[2] Schedule F provides that the Debtor owes $33,258.72 to College Foundation, Inc. ("CFI") and this amount represents 46.65% of $71,287.28 in unsecured debt listed on her Schedule F.

4

percent (25%) of those claims is $17,821.82.  Therefore, if the Debtor's current monthly income multiplied by 60 is not less than $10,950.00, a presumption of abuse arises under Section 707(b)(2).

In addition to a court's ability to find abuse under section 707(b)(1) of the Bankruptcy Code, even if a presumption of abuse does not arise or is rebutted by a debtor, a court has the authority to dismiss a case under section 707(b)(3).

Section 707(b)(3) provides:

In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in which subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider –

(A) whether the debtor filed the petition in bad faith; or

(B) the totality of the circumstances...of the debtor's financial situation demonstrates abuse.

BAPCPA includes the judicially created totality of the circumstances test in section 707(b)(3).  *In re Hartwick*, 359 B.R. 16, 20 (Bankr. D.N.H. 2007); *see also* Eugene R. Wedoff, *Means Testing in the New § 707(b)*, 79 AM. BANKR. L. J. 231, 236 (2005)(reading § 707(b)(3) to allow judicial determination of debt paying ability).  The changes in BAPCPA lowered the standard for a court to find abuse.  Pre-BAPCPA, a court was required to make a finding of "substantial abuse" of the provisions of the chapter 7.  However, BAPCPA specifically lowers the standard to simply "abuse." *In re Lipford*, 397 B.R. 320, 339 (Bankr. M.D.N.C. 2008).

Based on the facts and circumstances in this case, the Bankruptcy Administrator asserts that the presumption of abuse arises and that the case should be dismissed under Section 707.  In her Response, the Debtor disputes that she miscalculated her current monthly income arguing that the deduction of her school loan payment from her current monthly income as an expense on Form

B22A is appropriate.  She contends that because the school loan debt is not dischargeable,  there could be repercussions such as tax refund garnishments, social security garnishments, or default penalties for failing to timely pay the school loan debt.  Furthermore, the Debtor argues the limiting terms of her Prenup Agreement, and the necessity of her degree to maintain her employment are sufficient to establish that payment of the school loan should be considered a special circumstance allowing her to take the school loan payment as a deduction on Form B22A.  Furthermore, she states the marital deduction is appropriate, given the limited contribution of her husband to the household expenses and the terms of her Prenup Agreement.  She asserts that based on her calculations, she does not have any disposable monthly income and meets the means test standards such that the presumption of abuse under Section 707(b)(2) does not arise.  Therefore, the Debtor requests that the Motion to Dismiss be denied.

Current monthly income ("CMI") is defined by the Bankruptcy Code as the average monthly income from all sources that the debtor receives...without regard to whether such income is taxable income, derived during the 6-month period ending on the last day of the calendar month preceding the petition date if the debtor files a schedule of current income and expenditures (commonly known as Schedules I and J) and any amounts paid to the debtor on a regular basis for the household expenses of the debtor or the debtor's dependents, subject to certain limitations. 11 U.S.C. § 101(10A).

Part II of Form B22A is titled Calculation of Monthly Income for § 707(b)(7) Exclusion and provides two columns detailing both the debtor's income and the spouse's income. _See_ Lines 3-12 of Form B22A.  The calculation of current monthly income includes the income of both spouses, even if one is a non-filing spouse, and the non-filing spouse's contribution to the debtor's household

6

support. *In re Vollen*, 426 B.R. 359, 366 (Bankr. D.Kan. 2010)(determining that the debtor in a chapter 13 case failed to properly complete Form B22A and include the appropriate amounts for the marital deduction).

More specifically, Line 11, column A of the June 9th Amendment to Form B22A provides that the Debtor has a current monthly income of $2,100.55. Line 11, column B lists $10,506.83 as her spouse's current monthly income. Therefore, the combined current monthly income of the Debtor and her spouse for purposes of this Motion is $12,607.38.[3] *See* Line 18, Form B22A filed on June 9, 2010.

---

[3] The following table sets forth the actual monthly income, the amount of the marital deduction credited, and the calculation of current monthly income on the Form B22A documents filed by the Debtor. Initially, the Debtor failed to list her non-filing spouse's monthly income on Form B22A. However, as part of the March 2nd Amendments and subsequent amendments, the Debtor disclosed that her husband has a current monthly income of $10,506.83.

**Table 1 - Debtor's Calculation of Current Monthly Income on Form B22A**

| Date of Filing of Form B22A | Debtor's Current Monthly Income Line 11(A) | Spouse's Current Monthly Income Line 11(B) | Household Combined Current Monthly Income Line 12 | Marital Deduction Line 17 | Calculation of Current Monthly Income for § 707(b)(2) Line 18 |
|---|---|---|---|---|---|
| December 31, 2009 | $2,066.88 | None Shown | $2,066.88 | None | **$2,066.88** |
| March 2, 2010 | $2,290.88 | $10,506.83 | $12,797.71 | $4,521.83 | **$8,275.88** |
| March 17, 2010 | $2,290.88 | $10,506.83 | $12,797.71 | $5,670.33 | **$7,127.38** |
| June 9, 2010 | $2,100.55 | $10,506.83 | $12,607.38 | $8,103.83 | **$4,503.55** |

## MARITAL DEDUCTION

The marital deduction has been described as "that part of the non-debtor spouse's income that is not contributed to the debtor's household support" which should be excluded from the calculation of current monthly income. *In re Vollen*, 426 B.R. 359, 366 (Bankr. D.Kan. 2010). Line 17 of Form B22A provides for an adjustment to allow married debtors, who file individually, to deduct a portion of the non-filing spouse's income that is not within the definition of CMI, as set forth in the Bankruptcy Code. *In re Dugan,* 2008 Bankr. LEXIS 2813 *16 (Bankr. D.Kan. 2008). The amount listed on Line 17 as the marital deduction should be subtracted from the combined monthly income listed on Line 12 in order to calculate the current monthly income of a debtor. The net amount of the combined monthly income and the marital deduction is shown on Line 18 of Form B22A.

Based on her most recent Form B22A, the Debtor calculated the marital deduction as $8,103.83 for "[i]ncome not contributed to 'household exp' on Schedule J." June 9th Amendment to Form B22A; *see also* Table 1, fn. 2.(detailing the amounts listed by the Debtor on the earlier versions of her Form B22A). Therefore, based on the marital deduction, the Debtor calculates her CMI to be $4,503.55.

With each amendment, the Debtor filed a separate Schedule J outlining her spouse's monthly expenses. No additional evidence was introduced to substantiate the amount of the marital deduction used by the Debtor as part of the calculation of her CMI.[4]

---

[4] Although the Bankruptcy Administrator does not appear to dispute the ever-changing amounts credited by the Debtor as a marital deduction in each amendment, a question exists in the Court's eyes as to why there is such a vast difference between the marital deduction of $4,521.83 credited on the March 2nd Form B22A and the $8,103.83 marital deduction shown on the June 9th Form B22A. Such repeated amendments and changes in calculations for the purposes of overcoming the presumption of abuse may raise questions of credibility and overall good faith.

The Bankruptcy Administrator argues that the Debtor deducts certain expenses from her current monthly income both on Line 17 as a marital deduction and then again as Line 19A and Line 19B deductions from her net current monthly income shown on Line 18.

Based on the factual circumstances in this case, the Debtor is entitled to a deduction of $985.00 on Line 19A for food, clothing, and other items under the IRS National Standards for Food, Clothing and Other Items ("IRS Line 19A Standard"). At the hearing, the Debtor testified that her husband contributes approximately $120.00 for these household expenses on a monthly basis. However, the amount shown on Line 19A has not been reduced to reflect that the marital deduction includes the $120.00 contribution by her husband towards the Line 19A expenses. Because he contributes $120.00 towards this expense and that amount is included as part of the marital deduction, the Debtor must reduce the amount allowed under the IRS Line 19A Standards by $120.00 to prevent a double deduction of the $120.00 expense from her CMI. As listed on her most recent Form B22A, the Debtor credited a marital deduction that included a $120.00 contribution by her husband on Line 17. However, the Debtor then credited a second deduction of the $120.00 on Line 19A by crediting the full $985.00 allowed under the IRS Line A Standard. As a result of the husband's contribution, the Debtor is taking a double deduction of the expense and is only entitled to a credit of $865.00 on Line 19A, not $985.00 as shown on her Form B22A. The adjustment of this deduction increases her CMI by $120.00.

In addition, the Debtor commits a similar error in connection with her deduction listed on Line 19B.[5]  On Line 19B, the Debtor deducted $120.00 representing a $60.00 credit for each member of a two member household - based on the IRS Line 19B Health Care Standard.  However, the Debtor failed to take into account that the $60.00 deduction she may have been entitled to take for her non-filing spouse was already credited on Line 17 as part of the marital deduction.  Similar to the Line 19A double deduction of expenses to reduce her CMI, the Debtor is only permitted to take a credit for one person in the amount of $60.00 a month since she has already taken the marital deduction for her husband.  As such, the deduction for Line 19B should be $60.00, not $120.00 as listed on her most recently filed Form B22C. Therefore, adjustment of this double deduction increases her CMI by $60.00.

### DEDUCTION OF SCHOOL LOAN FROM CURRENT MONTHLY INCOME

Based on Schedule F, the Debtor has unsecured debt in the amount of $71,287.28.  College Foundation is listed as an unsecured creditor with a claim of $33,258.72 based on school loan debt incurred by the Debtor.

The Debtor testified that her school loan payments are $330.00 per month.  Based on the Response and the most recent Form B22A, she alleges that payment to CFI in connection with her

---

[5] Line 19B permits a debtor to deduct amounts consistent with the IRS National Standards for Out-of-Pocket Health Care ("IRS Line 19B Health Care Standard"). Household members under the age of 65 are allowed a credit of $60.00 per person on a monthly basis and a credit of $144.00 per person is allowed monthly for members who are over the age of 65.

10

school loans is an "other necessary expense"[6] and that she should be permitted to deduct this expense from her CMI as a result of her special circumstances.

The Bankruptcy Administrator disputes that school loans are an "other necessary expense" arguing that school loans are an unsecured claim like any other. Furthermore, he alleges that the Debtor has failed to meet her burden that she is entitled to deduct her school loan payment from her CMI based on a special circumstance.

---

[6] As was the case with the calculation of her current monthly income to determine if the presumption of abuse was present under Section 707(b)(2), the various filings of her Form B22A are inconsistent as to the allowance of her school loan as a deduction and under what category of expenses the deduction would be appropriate.

**Table 2 - School Loan Treatment on Form B22A**

| Date of Filing of Form B22A | Form B22A Line(s) Deducting School Loan |
|---|---|
| December 31, 2009 | School loan not provided for on Form B22A |
| March 2, 2010 | School loan listed on Line 42 - Future payments on secured claims. In the Motion to Dismiss, the Bankruptcy Administrator objected to the deduction of the school loan as a Line 42 deduction on the basis that a school loan is not secured. The Response of the Debtor recognized that a school loan payment should not be listed on Line 42. The Debtor asserts that the school loan should be a Line 56 deduction but, in her case, the mistake is not fatal as she did not need the school loan credit to satisfy the means test of Form B22A. |
| March 17, 2010 | School loan removed from Line 42. There is no reference to school loan on this amended B22A. |
| June 9, 2010 | School loan listed both on Line 29 - Other Necessary Expense: education for employment or for a physically or mentally challenged child and on Line 56 - Other Expenses and specifically states "Non-dischargeable student loan necessary for employment shown on Line 29 above." |

Subpart A - Deductions under Standards of Internal Revenue Service (IRS) of Part V of Form B22A includes Lines 19A through 32 whereby a debtor may deduct certain expenses from his or her CMI based on IRS Standards. Line 42 is included under Part V, Subpart B - Additional Living Expense Deductions of Form B22A. These, and other allowed deductions from Part V, are deducted from the CMI calculation shown on Line 18 to determine the monthly disposable income and establish if there is a presumption of abuse under Section 707(b)(2).

Part VII of Form B22A provides a debtor the opportunity to list additional expense claims. More specifically, Line 56 instructs a debtor to "[l]ist and describe any monthly expenses, not otherwise stated on this form, that are required for the health and welfare of you and your family and that you contend should be an additional deduction from your current monthly income under § 707(b)(2)(A)(ii)(I)..."

Pursuant to the Internal Revenue Service ("IRS"), student loans are included as one of several "Other Necessary Expenses" in § 5.15.1.10 of the IRS Manual. *In re Knight*, 370 B.R. 429, 436 (Bankr. N.D. Ga. 2007). Therefore, at first glance, student loan payments appear to qualify as allowable expenses under the IRS Standards set forth in the first sentence of Section 707(b)(2)(A)(ii)(I). *In re Knight,* 370 B.R. at 436-437. However, a closer reading of this section provides that "payments for debts" are excluded from being a qualified expense deduction. *Id*. Therefore, the Bankruptcy Code provides that student loans, which are clearly "debts," are precluded from "reasonably necessary" expenses under Section 707(b)(2)(A)(ii)(I). *In re Knight,* 370 B.R. at 437 (citations omitted). Consequently, a court must consider whether the payments on account of a school loan are a deductible monthly expense under Section 707(b)(2)(B) because of "special circumstances." *In re Knight,* 370 B.R. at 437.

The parties dispute that payments on account of a school loan are special circumstances as provided by Section 707(b)(2)(B).[7] The Debtor bears both the procedural and substantive burden to show the special circumstances which rebut the presumption of abuse of the provisions. *In re Fonash,* 401 B.R. 143, 147 (Bank. M.D. Pa. 2008)(citing *In re Patterson,* 392 B.R. 497 (Bankr. S.D. Fla. 2008)); <u>*See also*</u> *In re Haman*, 366 B.R. 307, 312 (Bankr. D.Del. 2007). The *Fonash* Court recognized that to satisfy the procedural requirements of Section 707(b)(2)(B)(ii), a debtor must

---

[7]    Therefore, based on the findings that the Debtor is required to reduce her monthly expenses shown on Lines 19(A) and (B) by $180.00 per month based on the marital deduction credit and that deduction of the school loan expense of $330.00 per month is not an appropriate expense under Section 707(b)(2)(A)(ii)(I) on Line 29, the Debtor's monthly disposable income is increased by $510.00 per month. The Debtor alleges her monthly disposable income is negative $25.25 per month.  This amount deducted from $510.00 a month gives the Debtor a monthly disposable income of $484.75 per month.  Based on Section 707(b)(2), the presumption of abuse arises as the Debtor's 60-month disposable monthly income is $29,085.00, exceeding the $10,950.00 limit under Section 707(b)(2). However, the Court's inquiry does not stop there. The Court must now consider whether payment of the school loan is a special circumstance which rebuts the presumption of abuse that has been established. 11 U.S.C § 707(b)(2)(B).

12

provide documentation for the expense or adjustment and a detailed explanation of the special circumstances that make the adjustments to income necessary and reasonable.  401 B.R. at 147. Furthermore, a debtor is required to "attest under oath to the accuracy of any information provided to demonstrate that additional expenses or adjustments to income are required." *Id*. at 147-148 (citing 11 U.S.C. § 707(b)(2)(B)(iii)).

The Debtor testified and submitted an affidavit that her employer, EMBARQ, restructured its departments and revised job descriptions several years ago.  The Debtor believed that as part of the restructuring, her job requirements would be changed such that she would not meet the minimum requirements.  The Debtor stated EMBARQ was offering a partial reimbursement program to assist employees in obtaining higher education such that they could satisfy the new job requirements.  As a result of the restructuring process, the Debtor determined she needed to obtain a college degree to meet the qualifications of any new job description and, therefore, protect her job.  The Debtor testified that she obtained an Associates Degree in 2006 and was promoted.  In 2009, the Debtor received her Bachelor of Science in Business Administration.  She contends that by obtaining the advance degrees she has increased her marketability to EMBARQ and qualified for additional advancements.  In her affidavit of June 9, 2010, she stated that she was "firmly convinced that the education expense and the advanced degrees which I received were absolutely necessary for [her] continued employment and advancement." Docket entry no. 29,  ¶ 1.

Furthermore, at the hearing, the Debtor testified that after a series of layoffs, she and another individual, who both have bachelor degrees, were called back to work by EMBARQ.  She stated that she believes the reason she was able to return to work was that she had obtained her degree. Without it, she does not believe she would have been given the opportunity to return to work after the layoff.

13

At the present time, she does not expect an increase in her salary and is, in fact, concerned about her ability to survive potential layoffs in the future.

Although the Debtor is married to a physician, she testified that due to her Prenup Agreement, she had no rights to any amounts earned by him during the marriage. As such, she indicated that they maintained separate checking accounts, never combined incomes, had separate individual debts, and paid their own expenses. No testimony was provided by the Debtor as to the extent to which the school loans were used for education costs. However, for the purpose of this opinion, the Court assumes that she incurred the school loans for the sole purpose to pay tuition and education related expenses, not basic necessities or living expenses.[8]

As part of her testimony at the hearing and in her affidavit, filed on June 10, 2010, the Debtor stated that to the best of her knowledge, her student loans are not subject to consolidation, reduction, modification, or elimination. She asserted that she has no alternative but to pay them in a timely manner. On page two of the June 10th Affidavit, the Debtor avers that any delay in the repayment of her school loan obligation, that is non-dischargeable, will result in additional interest and increase the amount of her obligation.

At the hearing, counsel argued that the consequences for the non-payment of non-dischargeable student loans would have a lasting impact on the Debtor's financial condition and ability to obtain a fresh start. Counsel asserted school loan lenders have the ability to garnish IRS refunds and social security payments if a borrower is in default. Furthermore, he argued that she

---

[8] No inquiry was made as to the dates of the school loans; how the proceeds were applied; whether the amount borrowed was only for tuition and education related expenses; whether the Debtor applied and received reimbursement from EMBARQ pursuant to the partial tuition reimbursement plan; and how the reimbursement funds, if any were used. However, for the purposes of this Opinion, the Court assumes that the amount borrowed was applied solely to tuition and other education related expenses.

would be exposed to default interest rates or other collection efforts based on the non-dischargeability status of a school loan obligation. Arguably, these remedies could have an impact on the non-filing spouse since the parties joint tax returns may be subject to garnishment.

Therefore, based on foregoing, the Debtor claims that a special circumstance exists that would permit her to include payment of the school loan exemption and rebut the presumption of abuse.

The Bankruptcy Administrator disputes that the circumstances of this Debtor are different than other individuals who obtain school loans.  He claims that to allow this Debtor to deduct college loan expenses as "special circumstances," would open the flood gates to all individuals seeking to pick and choose which unsecured creditors, including student loan vendors, that they would like to pay in full to the detriment of similarly situated creditors. The Bankruptcy Administrator further contends that the Debtor has failed to meet the burden that her circumstances are, in fact, "special."

No testimony was offered as to the specific information related to the school loans. However, attached her June 10th Affidavit, the Debtor provided certain documents related to her school loans.[9]

---

[9] The affidavit included: (1) a copy of a letter from CFI, dated November 23, 2009; (2) a copy of a notice regarding the bankruptcy filing dated January 12, 2010; (3) a copy of a statement requesting payment of $822.00 by December 12, 2009; (4) the back of the statement providing Explanations and Definitions of Important Terms on Front of Statement; (5) a copy of her Repayment Schedule Disclosure for Educational Loan(s) From College Foundation, Inc., dated November 23, 2009, relating to a consolidated loan of September 7, 2005; (6) a copy of her Repayment Schedule Disclosure for Educational Loan(s) From College Foundation, Inc., dated November 23, 2009, relating to a Stafford Loan, dated January 25, 2007; (7) a copy of her Repayment Schedule Disclosure for Educational Loan(s) From College Foundation, Inc., dated November 23, 2009, relating to a Stafford Loan, dated January 10, 2008, and a Stafford Loan, dated March 23, 2009; and (8) a copy of her Repayment Schedule Disclosure for Educational Loan(s) From College Foundation, Inc., dated November 23, 2009, relating to a Stafford Loan, dated February 12, 2009.

The Court does not make a finding as to whether such documents submitted by the Debtor are sufficient to satisfy her procedural burden based on the fact that the issue was not raised by the Bankruptcy Administrator. Based on the evidence, it can rely on other grounds to reach its conclusion that the deduction of student loans as an expense is not a "special circumstance" that rebuts the presumption of abuse. Therefore, the Court need not consider if the Debtor has satisfied her procedural burden.

In order to determine if a special circumstance exists to permit a debtor to take additional expenses or adjustments to his or her current monthly income, a Court should consider each case on a case-by-case basis. *In re Siler*, 426 B.R. 167, 172-173 (Bankr. W.D.N.C. 2010); *In re Champagne*, 389 B.R. 191, 200 (Bankr. D.Kan. 2008); *In re Zahringer*, 2008 Bankr. LEXIS 1770 *3 (Bankr. E.D.Wis. 2008); *In re Turner*, 376 B.R. 370, 378 (Bankr. D.N.H. 2007); *In re Knight*, 370 B.R. 429, 437 (Bankr. N.D.Ga. 2007); *In re Robinette*, 2007 Bankr. LEXIS 3523 *11-12 (Bankr. D.N.M. 2007); *In re Templeton*, 365 B.R. 213, 216 (Bankr. W.D. Ok. 2007). Section 707(b)(2)(B) lists two examples – a serious medical condition or a call or order to active duty in the Armed Forces – where Congress determined these to be special circumstances "for which there is no reasonable alternative" to allow for certain adjustments to current monthly income or additional expenditures. *In re Siler*, 426 B.R at 172-173; *In re Templeton*, 365 B.R. at 216; *In re Zahringer*, 2008 Bankr. LEXIS *3-4.

Courts are divided in their interpretation of "special circumstances." One group of courts determined that "special circumstances" should be narrowly interpreted and based upon the plain meaning of "special." *In re Siler,* 426 B.R. at 172 (citing *In re Delbecq*, 368 B.R. 754, 756-57 (Bankr. S.D. Ind. 2007); *In re Tauter*, 402 B.R. 903 (Bankr. M.D. Fla. 2009); *In re Patterson*, 392 B.R. 497 (Bankr. S.D. Fla. 2008); *In re Smith*, 388 B.R. 885 (Bankr. C.D. Ill. 2008), *In re Cribbs*, 387 B.R. 324 (Bankr. S.D. Ga. 2008); *In re Witek,* 383 B.R. 323, 330 (Bankr. N.D. Ohio 2007); *In re Pageau*, 383 B.R. 221, 226 (Bankr. D.N.H. 2008); *In re Haar*, 360 B.R. 759, 760 (Bankr. N.D. Ohio 2007); *In re Parulan*, 387 B.R. 168 (Bankr. E.D. Va. 2008)). The *Siler* Court notes that these cases find that in order for a debtor's circumstances to be "special," similar to those in the examples provided by Congress, they must be "necessary and reasonable" expenses where there is no

16

reasonable alternative other than the payment of expense. *In re Siler*, 426 B.R at 172 (citing *In re Tauter*, 402 B.R. 903 (Bankr. M.D. Fla. 2009)); *see also* In re Martin, 371 B.R. 347, 352 (Bankr. D.Ill. 2007)(stating that "special circumstances" should be construed as "uncommon, unusual, exceptional, distinct, peculiar, particular, additional or extra factors or conditions..."). This interpretation of "special circumstance" would prevent most debtors from meeting its high standard. *In re Siler,* 426 B.R. at 172; *see also* In re Haar, 360 B.R. 759, 760 (Bankr. N.D. Ohio 2007)(providing that Congress intended "to set this bar extremely high, placing it effectively off limits for most debtors"); *In re Zahringer*, 2008 Bankr. LEXIS 1770 (Bankr. E.D. Wis. 2008).

The second approach to the interpretation of "special circumstance" does not necessarily mean that the situation be extraordinary, outside of the control of a debtor, or always unanticipated. *In re Siler*, 426 B.R. at 172 (citing *In re Graham*, 363 B.R. 844, 850 (Bankr. S.D. Ohio 2007); *In re Thompson*, 350 B.R. 770, 777 (Bankr. N.D. Ohio 2006); *In re Armstrong*, 2007 Bankr. LEXIS 1812 *3 (Bankr. N.D. Ohio 2007); *In re Tamez*, 2007 Bankr. LEXIS 3523 *4 (Bankr. W.D. Tex. 2007); *In re Robinette*, 2007 Bankr. LEXIS 3523 *4 (Bankr. D N.M. 2007). *See also* In re Champagne*, 389 B.R. at 198; *In re Fonash*, 401 B.R. 143, 146 (noting "burden to establish special circumstances was not set particularly high, making the presumption truly rebuttable. The standard...is special, not extraordinary."); *In re Haman*, 366 B.R. 307, 313 (Bankr. D. Del. 2007)(finding that debtor does not need to demonstrate that special circumstances were involuntary; however, debtor still must meet necessary and reasonable standard under the statute); *In re Crego*, 387 B.R. 225, 228 (Bankr. E.D. Wis. 2008)(pointing out that "special circumstances" is not worded as harshly as other exceptions or limitations under the Bankruptcy Code, including section 523(a)(8) related to undue hardship).

17

As the *Siler* Court held, this Court agrees "that the congressional purpose behind the Means Test is best served by employing a narrow interpretation of the term 'special circumstances.'" *In re Siler*, 426 B.R. at 176.  In order for an expense to be allowed as a special circumstance, it must be "special" in relation to the circumstances of other debtors, must be reasonable and necessary, and must be an expense for which there is no reasonable alternative.  *Id.*

In addition, courts are also split as to whether student loan payments are encompassed under the "special circumstances."  The basis of this split appears to focus on the non-dischargeability of school loans.  *In re Siler*, 426 B.R. at 175; *see also* *In re Vaccariello*, 375 B.R. 809, 815 (citations omitted).  If a student loan is considered a special circumstance, it would permit payment of a general unsecured claim – the unsecured student loan – to be paid in full, while other unsecured creditors are paid nothing and discharged.  *Id.* at 175.  However, student loans do not carry priority status under the Bankruptcy Code.  *Id.*  Treating a school loan as a special circumstance solely on the basis of its non-dischargeability would bring into question whether other categories of non-dischargeable debts such as fraud, willful and malicious injury, drunk driving liabilities, and even some taxes should be considered a special circumstance and, therefore, given a priority that is not enumerated in Section 507(a).  *Id.* (citing *In re Vaccariello*, 375 B.R. at 815).  This Court agrees with the *Vaccariello* and *Siler* Courts in that the non-dischargeability of a debt should not necessarily constitute a special circumstance.  *In re Siler*, 426 B.R. at 175; *In re Vaccariello*, 375 B.R. at 815-816.  This Court has not found any legislative history or evidence of congressional intent that Congress, in fact, intended to categorically determine that a non-dischargeable debt is per se a special circumstance.  Therefore, the Debtor fails to establish that a special circumstance exists on the basis that her school loans are non-dischargeable.

Furthermore, although the Debtor contends that she was able to secure her position and advancement with her employment based on obtaining her degrees, there are no extraordinary circumstances surrounding the Debtor returning to school.  The Debtor testified that her employer was offering a partial tuition reimbursement program and that because of the changing marketplace at EMBARQ, she believed returning to school was necessary for her retention and continued employment. She stated that she believed it was because of her degrees that she was one of two people who was asked to return after layoffs.  However, there is no evidence before the Court that a degree was, in fact, necessary or required for her position.  Furthermore, although the Debtor paid for her education through the use of student loans,[10] such methods are not uncommon. *In re Vaccariello*, 375 B.R. at 816; *In re Pageau*, 383 B.R. at 228.  Due to the rising costs of advanced education, there is nothing rare or unusual about a student loan.  *In re Siler*, 426 B.R. at 175.  Therefore, her obligation to repay her student loans, by itself,[11] is not a special circumstance that would rebut the presumption of abuse.

In addition to the lack of uniqueness about her student loan indebtedness, the Debtor has failed to show that there is no reasonable alternative for its payment.  The Debtor testified that she is 55 years old and that her student loans must be repaid within 10 years. Furthermore, counsel stated that the Debtor would be subject to default interest rates and possible garnishments of tax refunds

---

[10] The Court assumes that the Debtor took advantage of the partial tuition reimbursement program offered by EMBARQ since she testified that one was offered.

[11] The Court recognizes that the Debtor and her husband have a financial arrangement whereby her husband does not contribute to her expenses. However, this arrangement itself does not sway the Court to believe that repayment of her school loans is a special circumstance. The Debtor would be responsible for her student loan obligation with or without any contribution from her husband and the Court does not believe that the lack of contribution from her husband for her education contributes to a finding of a special circumstance. The Debtor is gainfully employed and, at the time she returned to school, was fully aware of the terms of her Prenup Agreement, dated May 25, 2001.

19

or social security benefits.  With respect to the garnishments, those methods may, in fact, be viable alternatives. Although the Prenup Agreement signed by the Debtor requires her and her husband to pay their respective share towards income taxes, the Prenup Agreement does not bind the IRS or the school loan lender/servicing agency. In fact, the school loans could be paid through a tax garnishment resulting in an obligation between the Debtor and her spouse.  Thus, if the Debtor was in a chapter 13 plan, unsecured creditors, including the school loan lender, would be treated equally, as opposed to allowing a school loan lender to obtain priority treatment for allowance of its claim as a special circumstance.

As to a social security garnishment, such possible garnishment does not give rise to a finding of a school loan payment as a special circumstance. The Debtor is approximately 10 years from receipt of social security benefits.  The maximum period of repayment under a chapter 13 plan is five years (60 months) during which time, the school loan lender would receive payment for a portion of its claim.  The Debtor may be in a position subsequent to the completion of a plan to pay the remaining balance of her school loan in full.  The possibility of social security garnishments in ten years, combined with the characteristics of a school loan, does not rise to the level of a special circumstance.

Lastly, the Court questions if the Debtor may have alternative means of repaying her student loans. There was no evidence presented as to the origination date; the original principal balances; any amount paid; the type of loans; the repayment structure; the possibility of a deferment; the initial interest rate; the default interest rate, if applicable; or whether the Debtor was receiving any incentives for the timely payment of her school loans.

As part of her June 10th Affidavit, the Debtor submitted documents relating to her school loans. The Debtor stated on page 1: "[t]o the best of [her] knowledge this non-dischargeable student loan obligation is not subject to consolidation, reduction, modification or elimination and I have no alternative than to pay the same in a timely manner." However, the Debtor has failed to provide any documentation or evidence that she requested a consolidation, reduction of her monthly payments, modification, or *deferment* of her school loans. The College Foundation of North Carolina provides on its website, www.cfnc.org/paying/repaymentHelper/repayment.jsp, that unexpected circumstances, job loss, or other extenuating circumstances might allow for "temporary alternative repayment options..." The Debtor failed to provide any evidence that she sought a deferment of her loans in connection with this program. Furthermore, there appear to be alternative repayment plans available to borrowers, including the standard repayment plan which allows for the same monthly payment during the life of the loan; the graduated repayment plan providing for a smaller monthly payment in the early years and gradually increasing over the life of the repayment plan; the income sensitive repayment plan which allows for monthly payments calculated on one's gross monthly income; the extended repayment plan allowing borrowers to extend payments for a lengthened period of time, up to 25 years, for borrowers with more than $30,000.00 in outstanding principal and interest in Federal Family Education Loan Program monies borrowed after October 7, 1998; and the income-based repayment plan which is only available with respect to certain types of loans but is based on a financial hardship, family size, and the percentage of student loans to income. *See* www.cfnc.org/paying/repaymentHelper/repayment.jsp.

Although the Debtor may not have qualified for any of these programs, the Debtor has failed to provide the Court with any documentation[12] or testimony that she, in fact, investigated these alternative payment options. These methods may have offered her alternative payment options.

In addition, there is no evidence before the Court that the Debtor would be subject to a default interest rate.[13]   Attached as page 6 to the June 10th Affidavit is the Explanations and Definitions of Important Terms on Front of Statement. This page provides in the past due amount section that if a borrower fails to timely make a scheduled payment on or before the due date, the lender may report adverse information to credit agencies. There is no indication that a default interest rate may be incurred and the Debtor has failed to provide any additional documentation relating to such penalty.

Of concern to the Court is that the Debtor asserts that her loans are payable within ten years. However, the Repayment Schedules submitted in connection with the consolidated school loan, originating on September 7, 2005, provides that payments were to commence on December 10, 2009 and continue for a period of 172 additional months.  *See* attachments to June 10th Affidavit. This period exceeds the ten year time limitation testified to by the Debtor.  The four remaining loans set forth a commencement date of December 10, 2009 and have repayment periods between 9-10 years.

---

[12] There is a handwritten notation on page 3, dated November 29, 2009, and attached to the June 10th Affidavit. The notation references unemployment/forbearance: starts 12/10 - ends 3/11/10.  The Repayment Schedules attached to the affidavit are all dated November 23, 2009 and provide that the initial payment is due on 12/10/2009.  There is no evidence before the Court as to whether the Debtor applied for the forbearance as noted on page 3.

[13] Page 5 of the June 10th Affidavit provides that the debtor qualified for an interest rate deduction of 1% on two of her loans totaling approximately $11,983.70. Should she default in her payment under the terms of those two loans or consolidate these loans, the interest rate deduction could be discontinued.

Although there was no testimony regarding the payment history or deferment status of the school loans, the documents attached to the affidavit shed some light into the circumstances. As of the November 23, 2009 statement, the Debtor has paid $531.00 since the Debtor borrowed the funds in connection with her first student loan. The first loan, dated September 7, 2005 has a current principal balance of $13,627.26. The second loan, dated January 25, 2007, has a current principal balance of $6,079.82 and the Debtor has paid $62.00 towards that loan. The last time that payments were made on the first and second loans was in July 2007. Based on the pages submitted with the June 10th Affidavit, no monies have been paid in connection with the third, fourth, and fifth loans, dated January 10, 2008, February 12, 2009, and March 23, 2009. Two of these loans were in deferment as of the November 23, 2009 statement.[14]

A review of each of the Statements of Financial Affairs filed by the Debtor shows that within the ninety-days prior to the petition date, December 31, 2009, there were no payments made in connection with her school loans. The Debtor should have been aware that her student loan payments would commence at the completion of her degree program. Yet, now that her school loans payments are scheduled to commence, it appears to the Court that the Debtor is attempting to circumvent the Bankruptcy Code and free up funds to pay the non-dischargeable unsecured school debt, with interest, to the detriment of her other similarly situated unsecured creditors.[15]

---

[14] Typically loans are deferred for a period of six months after graduation or after a student drops below a minimum number of credit hours.

[15] The Debtor testified that she had the ability to make a payment of $330.00 per month on account of her school loan. Should this case be converted to a chapter 13, this evidence should be considered in the computation of a chapter 13 plan payment in accordance with *Lanning v. Hamilton*, – U.S. –, 2010 U.S. LEXIS 4568 (2010).

Therefore, based on the finding of a presumption of abuse pursuant to Section 707(b)(1) where the Debtor's 60-month disposable income of $29,085.00 exceeds $10,950.00[16] and the failure of the Debtor to meet her burden of demonstrating that special circumstances exist to allow the student loan expense in order to rebut the presumption of abuse set forth in Section 707(b)(2)(B), the Motion to Dismiss is **GRANTED**.  However, the Debtor shall have twenty (20) days from the entry of this order to convert her case to chapter 13.  Should the Debtor fail to convert within this time frame, the case is **DISMISSED** pursuant to Section 707(b)(1).

       **SO ORDERED.**

**END OF ORDER**

---

[16] Since the presumption of abuse has been established under Section 707(b)(2) and the Debtor has failed to rebut the presumption, the facts in this case establish abuse under Section 707(b)(1) and the Court declines to consider whether abuse exists under Section 707(b)(3). However, the Court notes that the Schedules that the Debtor initially filed failed to provide the income of the non-filing spouse as part of Schedule J and as part of the B22A Form filed by the Debtor.  The Debtor then filed three amendments to Schedule I, Schedule J, and Form B22A.  The multiple amendments to these Schedules and Form B22A raises questions, as "inaccuracies of a debtor's schedules tend to show abuse." *See Lipford*, 397 B.R. 320, 338; *In re Myers*, 2009 Bankr. LEXIS 1237, *17 (Bankr. M.D.N.C 2009).



Helping you plan, apply, and pay for college



866-866-CFNC(2362)

| Sign in | Create My CFNC Account

About CFNC | Contact Us | Resources/Videos | Need Help? | Advanced Search    Search CFNC    GO



Savings Plan     Grants and Scholarships     Part Time Work     Loans     Installment Payment Plans     Repayment

## Repayment Options

### Borrower Benefits

The NC Advantage on CFI loans helps make college more affordable. See how much you'll save on a Stafford, PLUS or Consolidation Loan from CFI.

A Teacher and Counselor Loan Payment Holiday benefit available in December.  See if you're eligible!

### Repayment Plans

Realizing borrowers' individual circumstances will vary, CFI offers several repayment options. Which plan is the right option for you?

- Standard Repayment Plan - You pay the same monthly payment amount (including principal and interest) throughout the repayment period.

- Graduated Repayment Plan - You start with a lower monthly payment at the beginning of your repayment period, then gradually increase over the course of the repayment period.

- Income-Sensitive Repayment Plan - You make a monthly payment based on a percentage of your monthly gross income.

- Extended Repayment Plan - You extend payments for a lengthened repayment term of up to 25 years. (Available only to borrowers who received their first loan on or after October 7, 1998, and have more than $30,000 in outstanding principal and interest through the Federal Family Education Loan Program [FFELP].)

- Income-Based Repayment Plan (IBR) - This repayment plan was developed to assist borrowers who are having difficulty making their payments because they have high student debt levels relative to their incomes. The program is available for Stafford Loans, PLUS Loans to graduate students and Consolidation Loans with no underlying parent PLUS Loans. Borrowers must exhibit a partial financial hardship (PFH) as defined by federal regulations to enroll in an IBR plan. PFH is based upon the borrower's income, poverty level for the borrower's state of residence, family size and student loan indebtedness. Borrowers must recertify family size and income each year. This plan became available July 1, 2009. For more information on IBR, click the IBR link.
  Income-Based Repayment (IBR) Calculator
  Download Income-Based Repayment (IBR) PDF form

The Standard Repayment Plan, of course, suits the needs of most borrowers. But if you are interested in any of the other repayment plans and want to know if you qualify, please contact the CFI Repayment Call Center (919/821-4743 or toll free 1-800/722-2838) for more information.

### Deferments & Forbearances

During your post-college years, you begin to build a career and establish credit. This is also the time during which you will repay your student loan(s) - your repayment period - an important part of establishing good credit. Unexpected circumstances can occur that may make meeting your repayment obligations difficult. Because of job loss or other extenuating circumstances, you may want and need to consider temporary alternative repayment options, also known as deferments and forbearances.

### Loan Consolidation

If you have more than one education loan or a very large loan and are having difficulty making the scheduled payments, a consolidation loan might be the best solution. Consolidation allows you to lower your monthly payment amount by lengthening the repayment period beyond the standard 10-year schedule. Depending on the amount of your education loan debt, you may qualify to have your repayment period extended to a maximum of 30 years, which would significantly reduce your monthly payment. Consolidation loans offer several repayment options (including graduated, income-sensitive and extended) plus deferment and forbearance benefits. If you want to consider managing your education loan debt with a consolidation loan, CFI can help.

Copyright © 2001- 2010 College Foundation, Inc. All rights reserved.
Site Map  |  Privacy Policy  |  Technical Support